```
              IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA


AMAZON PRODUCE NETWORK, LLC,         :
                                     :
            Plaintiff,               :   CIVIL ACTION
                                     :
     v.                              :   No. 06-cv-4342
                                     :
M/V LYKES OSPREY and MONTEMAR        :
MARITIMA S.A.,                       :
                                     :
            Defendants.              :
```

## MEMORANDUM AND ORDER

**Joyner, J.**                                         **April 10, 2008**

Presently before the Court is Defendant Montemar Maritima S.A.'s Motion for Summary Judgment (Doc. No. 11), Plaintiff Amazon Produce Network, LLC's Response (Doc No. 13), Defendant's Reply (Doc. No. 16), and Plaintiff's Surreply (Doc. No. 17).  For the reasons set forth below, the Court DENIES Defendant's Motion.

## BACKGROUND

This case involves a claim for damage to a shipment of mangoes carried by sea on the M/V Lykes Osprey from Salvador, Brazil to Houston, Texas.  Plaintiff Amazon Produce Network, a fruit importer, is the consignee of the damaged cargo.  Sometime prior to August, 2005, Amazon Produce arranged for transport of a

1

shipment of mangoes, to be shipped by Muranaka Comercio Import Export L.T.D.A, from Brazil to the United States with Defendant Montemar Maritima, also known as Libra Shipping.  Montemar then chartered space for the shipment on the M/V Lykes Osprey, and informed Muranaka and Amazon that the ship would depart the port of Bahia in Salvador, Brazil, on August 29, 2005.  Amazon was advised to have its mangoes ready at the port for loading and departure by August 26, 2005, for loading onto the vessel.

On August 23, 2005, Montemar informed Muranaka and Amazon that the Lykes Osprey would be delayed in its arrival at Salvador.  Thus, Montemar stated that the Lykes Osprey would arrive in Salvador instead on August 31, 2005.  According to Amazon, based on this information the mangoes at issue were harvested, specifically for this shipment, two days before this date.  Amazon asserts that on August 30, 2005, the mangoes were packed in two shipping containers and delivered to the port in preparation for loading on the Lykes Osprey when it arrived the following day.

However, the Lykes Osprey did not in fact arrive in Salvador until September 9, 2005, purportedly because of delays in previous ports on its way to that port.  It is undisputed that neither Muranaka nor Amazon were informed of this delay, though Montemar claims the progress of the ship could have been tracked at the request of the shipper.  At this point, according to Amazon, the mangoes had a post-harvest age of roughly thirteen

days.  The shipment was loaded onto the Lykes Osprey, which departed that day for Houston via the Gulf of Mexico.
On September 18, 2005, the National Weather Service released an advisory that Tropical Storm Rita had developed into Hurricane Rita, a category 3 hurricane located in the Gulf of Mexico.  As a result of the developing severe weather, the port of Houston was closed to all vessel traffic on September 21, 2005.  To avoid the storm, the Lykes Osprey diverted to Altamira, Mexico, where it discharged its cargo to await the reopening of the Houston port. According to Plaintiff, Muranaka and Amazon were informed that the mangoes were to be loaded on the TMM Colina to bring the shipment from Altamira to Houston.

Upon being notified that the port was to reopen, however, Montemar arranged for the mango containers to be loaded on the M/V Libra Santos, not the TMM Colina, to finish the journey to Houston.[1]  Plaintiff claims that this caused further delay because it needed to secure documentation for the Department of Homeland Security and U.S. Department of Agriculture reflecting the new shipping arrangement.  In any event, it is undisputed that the Libra Santas arrived in Houston on October 7, 2005, and discharged the cargo on October 8, 2005.  At this point, the post-harvest age of the mangoes was approximately forty days, far

---

[1] Montemar appears to claim that the mangoes were not placed on the Colina because the Houston port continued to remain closed when the Colina was to arrive in Altamira.

longer than the twenty-five day limit recommended by the Department of Agriculture.

On October 13, 2005, the mangoes were retrieved by the Plaintiff, who found them to be in a significantly deteriorated condition.  Plaintiff alleges that the lag in time between the cargo's discharge and its retrieval from the port was due to a failure on Defendant's part to communicate that the mangoes were shipped via the Libra Santos, rather than the Colina.

*This Lawsuit*

Plaintiff Amazon Produce filed its Complaint against Defendants on September 28, 2006, alleging that the mangoes being imported into the United States were made unsaleable as a result of certain breaches by Defendants of their obligations as a common carrier of the goods.  Plaintiff alleges that under the Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 1300 *et seq.* and the Harter Act, 46 U.S.C. §§ 190-96, Defendants are liable for the damages sustained by the mango shipment because, *inter alia*, they failed to provide a seaworthy place for the care, handling, stowage, and carriage of the shipment, and "did not use proper care under the circumstances."  More specifically, Plaintiff asserts that Defendants were negligent in failing to warn it of the lateness of the vessel coming into Salvador, Brazil to pick up the shipment, and in failing to inform it of

4

the actions taken in response to the development of Hurricane Rita and the resulting closure of the Houston ports.  Plaintiffs assert that as a result of these actions or omissions, the shipment time was extended so long that the mangoes rotted before they could be retrieved and sold.

On May 10, 2007, Defendant Montemar Maritima filed its Motion for Summary Judgment.  Montemar asserts that COGSA is the only relevant statute, and that under COGSA, it cannot be held liable because the damage was caused by a combination of the effects of Hurricane Rita and the natural deterioration of the mangoes over time.  Montemar also argues that the Bill of Lading it issued when it picked up the mango shipment contains a "Liberties Clause," which explicitly absolves the shipping company of any liability for damage due to delay in arriving at the final destination.

## STANDARD OF REVIEW

It is recognized that the underlying purpose of summary judgment is to avoid a pointless trial in cases where it is unnecessary and would only cause delay and expense.  Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976).  Summary judgment is proper "if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a

matter of law." Fed. R. Civ. P. 56(c).  An issue is genuine only if there is sufficient evidentiary basis on which a reasonable jury could find for the non-moving party, and a factual dispute is material only if it might affect the outcome of the suit under governing law.  Kaucher v. County of Bucks, 456 F.3d 418, 423 (3d Cir. 2006), citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  If the non-moving party bears the burden of persuasion at trial, "the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden."  Id., quoting Wetzel v. Tucker, 139 F.3d 380, 383 n. 2 (3d Cir. 1998).  In conducting our review, we view the record in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor.  See Bowers v. Nat'l Collegiate Athletic Ass'n, 475 F.3d 524, 535 (3d Cir. 2007).  However, there must be more than a "mere scintilla" of evidence in support of the non-moving party's position to survive the summary judgment stage. Anderson, 477 U.S. at 252.

## DISCUSSION

Plaintiff argues that Defendant acted negligently in two instances, and that these negligent acts or omissions caused the loss of the mangoes in saleable condition.  Plaintiff's primary

allegation is that Defendant was negligent in failing to inform either Muranka (the shipper) or Amazon (the consignee) of the Lykes Osprey's delayed arrival into Salvador, Brazil for pickup of the mangoes.  Plaintiff asserts that if it had known of the delay, it would have either waited to harvest the mangoes for shipment, or sold the already-harvested mangoes in Brazil and thereby mitigate the financial damages.  Second, Plaintiff argues that Defendant was negligent in providing insufficient information and warning about the diversion to Altamira, Mexico caused by the development of Hurricane Rita.  Plaintiff asserts that Defendant should have contacted it for advice about how to proceed, so that Plaintiff could have made alternative shipping arrangements or sold the mangoes in Mexico.  Finally, Plaintiff seems to assert that the delay at Altamira was longer than needed because it was possible for the ship to arrive in Houston earlier, or to select another U.S. port as a destination for the mango shipment.  With all of these assertions, Plaintiff is essentially claiming that Defendant's negligence in failing to properly inform it about the route and schedule of the mango shipment was the proximate cause of the mangoes rotting before they could be delivered to the United States in a saleable condition.

**I.  COGSA is the Applicable Law**

     The Carriage of Goods by Sea Act (COGSA), 46 U.S.C. § 30701 et seq., provides an exclusive remedy for damage to cargo incurred during carriage between foreign and United States ports. Timbauba Agricola S.A. v. M/V Cap San Raphael, 2004 WL 2755541, at *2 (E.D. Pa. Dec. 2, 2004)(citing Polo Ralph Lauren, L.P. v. Tropical Shipping & Constr. Co., 215 F.3d 1217, 1220-21 (11th Cir. 2000)).  It is undisputed that Defendant's actions after the mangoes were loaded in Brazil and before they were discharged in Houston fall within the scope of COGSA.  Indeed, COGSA by its terms applies to the "tackle-to-tackle" period - that is, from the time when the goods are loaded on the vessel to the time that they are discharged at the final destination.  46 U.S.C. § 30701; See also Sompo Japan Ins. Co. of Am. v. Union Pacific R.R. Co., 456 F.3d 54, 58 (2d Cir. 2006).

     Parties to a maritime agreement may also contractually extend the scope of COGSA beyond the "tackle-to-tackle" period of responsibility.  See id.  Defendant asserts that that was the case here, and that the Bill of Lading included a provision stating that COGSA governed before loading and after discharge. Nevertheless, Plaintiff argues that the Harter Act, 46 U.S.C. Appx. § 192, and not COGSA, governs the period of time preceding the loading of the mangoes onto the Lykes Osprey in Brazil.

Plaintiff acknowledges that the Bill of Lading explicitly extends COGSA beyond its statutory scope, but asserts that the extension provisions only apply in the United States.  The Bill of Lading issued by Defendant provided:

> The provisions stated in COGSA shall govern the Goods before they are loaded on and after they are discharged from the Vessel and throughout the entire time they are in the custody of the Carrier at a United States port.

P. Surrep. Ex. 4, Para. 2.  Plaintiff argues that this clause is ambiguous, and that it should be interpreted as extending COGSA beyond the "tackle-to-tackle" period only in a United States port.  We believe this is not a reasonable interpretation of the provision and, in fact, find that the clause is not ambiguous and need not be construed against the drafter (i.e. Montemar).  The language of the clause clearly describes COGSA's coverage in two separate situations: (1) "before [the goods] are loaded on and after they are discharged from the Vessel"; and (2) "throughout the entire time they are in the custody of the Carrier at a United States port."  This language unambiguously extends COGSA to the period "before the goods were loaded" in any port, not just those in the United States, and is not subject to multiple interpretations.  Furthermore, Plaintiff's proposed interpretation is unreasonable given the circumstances of the agreement - it is simply nonsensical that a Carrier would include

9

in its Bill of Lading a provision explicitly extending COGSA to "before loading in a United States port" when both parties knew that the goods were to be loaded in Brazil.

Accordingly, we find that under the provisions of the Bill of Lading, COGSA governs the shipping transaction between the parties before us at all relevant times. See Uncle Ben's Int'l Div. of Uncle Ben's, Inc. v. Hapag-Lloyd Aktiengesellschaft, 855 F.2d 215, 217 (5th Cir. 1988)(recognizing extension of COGSA to preloading period via the bill of lading).[2]

## II.  Analysis under COGSA

COGSA sets forth a complex burden-shifting scheme for determining liability for damage to goods incurred during shipping.  First, a plaintiff shipper must establish a *prima*

---

[2] We note that some cases dealing with the contractual extension of COGSA beyond the "tackle-to-tackle" period assert or imply that COGSA can be extended to such periods only to the extent that it does not conflict with the Harter Act.  See, e.g., Sompo Japan Ins. Co., 456 F.3d at 71 ("In light of the contractual nature of period of responsibility provisions, courts have routinely held that contracts extending COGSA beyond the tackles must give way to conflicting law.").  Many of these cases, however, deal with COGSA's (and the incorporating contract's) $500-per-package limitation on liability. See, e.g., Schramm, Inc. v. Schipco Transp., Inc., 364 F.3d 560, 565 (4th Cir. 2004)(finding that the limitation applied because included in the bill of lading, even though this provision conflicted with the Harter Act).  The parties have not raised that issue here, however, and Plaintiff has not otherwise explained how the Harter Act would allow it to survive summary judgment instead of COGSA, because neither statute allows carriers to contract away liability for negligence, as we discuss in greater detail below. Accordingly, we decline to reach the question of whether COGSA is consistent with the Harter Act, and we will simply assume – for purposes of this Motion – that COGSA applies to the preloading period.

*facie* case that (1) the cargo was loaded undamaged onto the carrier's ship, and (2) the cargo was damaged when it was unloaded from the ship at the point of destination. America S/A Frutas e Alimentos v. M/V Cap San Rafael, 426 F. Supp. 2d 312, 317 (E.D. Pa. 2006).  If the plaintiff succeeds in making out a prima facie case, the burden shifts to the carrier to prove that the damage was caused not by its own negligence, but by one of a number of exceptions enumerated in the statute.  46 U.S.C. § 30706; see also America S/A Frutas e Alimnentos, 426 F. Supp. 2d at 317.3  At this step, the carrier may also rebut the *prima facie* case by showing that it exercised due diligence in preventing damage to or loss of the cargo.  Sun Co. Inc. v. S.S. Overseas Arctic, 27 F.3d 1104, 1109 (5th Cir. 1994).  If the carrier succeeds in rebutting the *prima facie* case, the burden shifts back to the plaintiff to prove that the carrier's negligence was at least a concurring cause of the loss.  Id. Should the plaintiff succeed in making such a showing, the burden of proof arrives at its final port with the carrier, who must establish exactly how much loss is attributable to its own negligence, and how much loss is attributable to some other

---

[3] In relevant part, COGSA mandates: "A carrier and the vessel are not liable for loss or damage arising from - (1) dangers of the sea or other navigable waters; (2) acts of God; . . . (5) inherent defect, quality, or vice of the goods."  46 U.S.C. § 30706(b).

cause, such as the plaintiff's negligence or a cause listed in the statutory exceptions.  Id.; America S/A Frutas e Alimentos, 426 F. Supp. 2d at 317, citing Schnell v. The Vallescura, 293 U.S. 296 (1934).

We find that Plaintiff has created sufficient issues of fact as to Defendant's alleged negligence to survive the COGSA standard on summary judgment.  First, Plaintiff has submitted evidence supporting its claim that Defendant was negligent in failing to warn about the initial delay in the Lykes Osprey's arrival at Salvador, Brazil.  In his affidavit, Flavio Muranaka, the Managing Partner of the export company that arranged for Plaintiff's mango shipment, testified to the industry custom regarding delays:

> It is the custom and practice between fruit shippers in South America, and the shipping lines that provide the refrigerated cargo vessels for shipment that when there is any change in the scheduled arrival of a ship that will be picking up fruit for export that the shipping line will so advise us.

P. Surrep. Ex. 6, p. 1.  Muranaka's affidavit further stated that Libra/Montemar initially abided by this custom in advising Muranaka about the date by which the mango shipment should be ready for pickup by the Lykes Osprey.  According to Muranaka, however, Libra/Montemar failed to advise them to change those

plans as a result of delays in the ship's schedule.  Rather, he testifed that they "received no information from Libra/Montemar after August 23, 2005, that the arrival of the MV Lykes Osprey would be further delayed in arriving at the port of Bahia [in Salvador, Brazil] after August 31, 2005."  P. Surrep. Ex. 6, p. 2.  Finally, Muranaka noted that after the shipment was finally picked up in Brazil, "Libra/Montemar kept [them] advised of the location of [their] shipment throughout the voyage, consistent with the custom and practice for Libra/Montemar to provide us with this information prior to shipment, during the voyage and at discharge. . . .  The shipping lines do not expect us to track the ships . . . ."  Id.  Muranaka's testimony is sufficient to create an issue as to whether Defendant breached a custom on the part of the carrier to inform its customers of any delays in a ship's schedule.[4]

---

[4] Defendant has suggested that Amazon, the consignee, cannot base its arguments on the fact that a duty was owed to the *shipper*, who would be the party receiving any information about schedule delays.  We disagree.  Defendant's suggestion does not cite any applicable law on this point, and is contrary to the vast body of case law in which the consignee is the party bringing suit for damage to the goods in which it has an interest.  See, e.g., Ferrostaal, Inc. v. M/V Sea Phoenix, 447 F.3d 212 (3d Cir. 2006)(negligence-based suit under COGSA brought by consignee).  We also note that Gilmar Mello, the managing partner of Amazon Produce, testified in both his deposition that any information about scheduling given to the shipper was passed on to him as a matter of course, since his company was involved in scheduling the harvesting of the mangoes for shipment.  He also stated in his affidavit that Amazon was informed of the initial delay in the arrival of the Lykes Osprey at Bahia port, but not the later delay.  We find this testimony to be sufficient at the summary judgment stage to withstand Defendant's passing attempt at an attack on the consignee's ability to make the claim that is before us here.

13

Defendant, for its part, has not put forth any evidence whatsoever on the industry custom as to information about delays, and has only provided a printout of the ships' schedules that could have been monitored by shippers.  Thus, Defendant's argument that it was incumbent upon the shipper and/or consignee to track the status of the vessels and to know that delays "frequently" occur does not allow it to prevail on summary judgment, because we are not provided with any industry standard that would deem those to be reasonable assumptions by the carrier.  We also note that Defendant's argument is belied by the fact that it actually *did* take the initiative to inform the shipper of the Lykes Osprey's first schedule change, from August 26, 2005 to August 31, 2005, and by Muranaka's testimony regarding their usual practice.  This, at the very least, creates an issue as to whether there was a customary practice of informing a shipper in Plaintiff's position of a contracted vessel's status.

Defendant also points out that the Bill of Lading contained a clause disclaiming any liability for damage to goods due to delay.  Specifically, Paragraph 16 of the Bill of Lading states that "[i]n no event shall the Carrier be liable for more than loss or damage actually sustained.  The Carrier shall not be liable for delay or for any consequential or special damages."

14

P. Resp. Ex. 4, p. 3.  Defendant also points out that Rule 8.E(B)(5)(2) of Montemar's tariff, which is captioned "Delay," provides, *inter alia*, that "the Carrier shall in no circumstances be liable for direct, indirect or consequential loss or damage caused by delay."  Citing America S/A Frutas e Alimentos, 426 F. Supp. 2d at 318, Defendant argues that under COGSA parties to a maritime contract are free to contract away liability for delay, and thus Plaintiff's claim cannot survive summary judgment under the terms of the Bill of Lading and the applicable tariff.  Defendant's reliance on America S/A Frutas e Alimentos, however, is misplaced.  That case, which also dealt with a damaged shipment of mangoes and a very similar bill of lading, actually stated that "any damage to the mangoes due *solely* to delay is not recoverable by Plaintiffs."  Id. (emphasis added).  The Court recognized, in fact, that "a carrier may not disclaim liability for failure to comply with the duties enumerated under COGSA," and thus Defendants could "still be liable for damage due to negligence."  Id.  Here, Plaintiff alleges that it was Defendant's negligence in failing to advise about shipping delays and in failing to divert to another port when Houston was closed that caused the mangoes to arrive in the United States in a sub-optimum condition.  Because Defendant could not disclaim liability for such negligence under COGSA, its reliance on the

15

"Delay" clauses in the Bill of Lading and tariff is insufficient to grant summary judgment on Plaintiff's claims.

Finally, Defendant argues that Plaintiff's claim that it was negligent in diverting to Altamira, Mexico to avoid Hurricane Rita cannot stand because the Bill of Lading also disclaimed liability for deviation in its route to Houston.  Specifically, the Bill of Lading contained a "Liberties Clause," which stated, in relevant part:

> In any situation whatsoever, including but not limited to political disturbances, strikes or work stoppages or closures or blockages [of] waterways, which in the judgment of the Carrier or Master is likely to give rise to risk of . . . damage, delay or disadvantage to the Vessel, Goods and/or those onboard, the Carrier or Master shall . . . have the right to stop or delay the Vessel, awaiting the removal of any such hindrance or obstruction . . . at the risk and expense of the Merchant.

P. Surrep. Ex. 4, para. 8.  Referring to the Liberties Clause, Paragraph 4 of the Bill of Lading also stated, in relevant part:

> The scope of the voyage herein contracted for shall include usual or customary or advertised ports of call. . . .  The vessel may call at any port for any purpose whatsoever and whether or not connected with the Carriage of the Goods, including loading or unloading other goods and/or for the purpose of the current voyage or of a prior or subsequent voyage . . . remain in port . . . and save or attempt to save life or property, and all of the foregoing are included in the contracted voyage.  Anything done in accordance with this Clause 4 and Clause 8 hereof or any delay arising therefrom shall be deemed to be within the scope of the voyage herein and shall not be a deviation.

P. Surrep. Ex. 3, Para. 4.  Defendant asserts that because the Bill of Lading contained a Liberties Clause allowing for such changes in the route, its decision to discharge the cargo at Altamira, Mexico to wait for the reopening of the Houston Port was not an unlawful deviation.  Therefore, Defendant argues, Plaintiff cannot recover for damages stemming from that action.

As the Third Circuit has noted, in admiralty law the term "deviation" has come to mean "any variation in the conduct of a ship in the carriage of goods whereby the risk incident to the shipment will be increased," which includes conduct such as "delay in carrying the goods." SPM Corp. v. M/V Ming Moon, 965 F.2d 1297, 1303 (3d Cir. 1992).  The mere existence of a Liberties Clause, however, is not enough to defeat liability.  Rather, "COGSA forbids deviations from the scheduled voyage that are 'unreasonable,' regardless of the provisions of the agreement between the parties." Berkshire Fashions, Inc. v. M.V. Hakusan II, 954 F.2d 874, 883 (3d Cir. 1992).  In determining whether the defendant's conduct was an unreasonable deviation, the Third Circuit has used the "customs and usages of the maritime trade" as a benchmark.  SPM Corp., 965 F.2d at 1304; see also Berkshire Fashions, 954 F.2d at 881.

On the issue of whether Defendant's reaction to the closing of the Port of Houston was reasonable, Plaintiff submitted the affidavit of Joseph Smith, the claims investigator who engaged in a joint survey and investigation with Libra/Montemar of the mangoes at issue here.  Mr. Smith testified that the "custom in the maritime industry," when a port is closed due to reasons such as weather, is that the "carrier generally knows sufficiently in advance of arrival whether the port will be open or closed to discharge the cargo."  P. Resp. Ex. 2.  Mr. Smith testified that Libra/Montemar would have known about Hurricane Rita on September 18, 2005; however, the Lykes Osprey continued towards the Gulf of Mexico even though the ports on the eastern coast of the United States were open and not threatened by the approaching storm.  Viewing it in the light most favorable to the Plaintiff, we find this testimony creates an issue of fact as to whether Libra/Montemar's actions in responding to the storm and the closure of the Houston Port were reasonable.  Accordingly, in addition to the issues created regarding Defendant's failure to advise about the initial schedule delay, there are sufficient issues of fact to allow this claim to survive summary judgment.

**III. Conclusion**

Under the Bill of Lading, COGSA is the applicable law governing the transaction at issue at all relevant times. However, under COGSA Defendant cannot contract away its liability for damages that came as a result of its own negligence. Viewing the facts in the light most favorable to the Plaintiff, as we must on a Motion for Summary Judgment, we find that Plaintiff has created genuine issues of fact as to Defendant's negligence in its failure to advise about the initial, nine-day delay in picking up the goods and in its response to the development of Hurricane Rita. In particular, there are genuine questions as to the maritime custom, and indeed the regular practice of this particular carrier, which are the standards by which a finder of fact will judge Defendant's conduct. Accordingly, we must DENY Defendant's Motion for Summary Judgment as to Plaintiff's claim under COGSA.

An order follows.

```
            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF PENNSYLVANIA


AMAZON PRODUCE NETWORK, LLC,       :
                                   :
          Plaintiff,               :   CIVIL ACTION
                                   :
     v.                            :   No. 06-cv-4342
                                   :
M/V LYKES OSPREY and MONTEMAR      :
MARITIMA S.A.,                     :
                                   :
          Defendants.              :
```

ORDER

AND NOW, this 10th day of April, 2008, upon consideration of Defendant Montemar Maritima, S.A.'s Motion for Summary Judgment (Doc. No. 11), and responses thereto, for the reasons stated in the accompanying memorandum, it is hereby ORDERED that the Motion is DENIED.


                                     BY THE COURT:



                                     s/J. Curtis Joyner
                                     J. CURTIS JOYNER, J.